**Slip Op. 18-5**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **PROSPERITY TIEH ENTERPRISE CO., LTD.,** | |
| Plaintiff, | |
| and | |
| **YIEH PHUI ENTERPRISE CO., LTD,** | |
| Plaintiff, | |
| v. | **Before: Timothy C. Stanceu, Chief Judge** |
| **UNITED STATES,** | **Consol. Court No. 16-00138** |
| Defendant, | |
| and | |
| **AK STEEL CORP., NUCOR CORP., STEEL DYNAMICS, INC., CALIFORNIA STEEL INDUSTRIES, INC., ARCELORMITTAL USA LLC, and UNITED STATES STEEL CORP.,** | |
| Defendant-Intervenors. | |

**OPINION AND ORDER**

[Remanding to the agency a determination in an antidumping duty investigation of certain corrosion-resistant steel products from Taiwan]

Dated: January 23, 2018

*Donald B. Cameron*, Morris, Manning & Martin LLP, of Washington, D.C., for plaintiff Prosperity Tieh Enterprise Co., Ltd. With him on the brief were *Julie C. Mendoza*, *R. Will Planert*, *Brady W. Mills*, *Eugene Degnan*, and *Mary S. Hodgins*.

*Kelly A. Slater*, Appleton Luff Pte. Ltd., of Washington, D.C., for plaintiff Yieh Phui Enterprise Co., Ltd. With her on the brief were *Jay Y. Nee* and *Edmund W. Sim*.

*Elizabeth A. Speck*, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant.  With her on the brief were *Chad A. Readler*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director.  Of counsel was *Michael T. Gagain*, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

*Stephen A. Jones*, King & Spalding, LLP, of Washington, D.C., for defendant-intervenor AK Steel Corp.  With him on the brief was *Daniel L. Schneiderman*.

*Alan H. Price*, Wiley Rein LLP, of Washington, D.C., for defendant-intervenor Nucor Corp.  With him on the brief was *Timothy C. Brightbill*.

*Roger B. Schagrin*, Schagrin Associates, of Washington, D.C., for defendant-intervenors Steel Dynamics, Inc. and California Steel Industries, Inc.

*John M. Herrmann, II*, Kelley Drye & Warren, LLP, of Washington, D.C., for defendant-intervenor ArcelorMittal USA LLC.

*Jeffrey D. Gerrish*, Skadden Arps Slate Meagher & Flom, of Washington, D.C., for defendant-intervenor United States Steel Corp.

Stanceu, Chief Judge: In this consolidated action,[1] plaintiffs contest an administrative decision issued by the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") to conclude an antidumping duty investigation on certain corrosion-resistant steel products ("CORE") from Taiwan (the "subject merchandise").[2]  The court remands the determination to Commerce for further consideration and redetermination.

---

[1] Consolidated under *Prosperity Tieh Enterprise Co. v. United States* (Ct. No. 16-00138) is *Yieh Phui Enterprise Co. v. United States* (Ct. No. 16-00154).  Order (Oct. 20, 2016), ECF No. 47.

[2] The investigation covered "flat-rolled steel products, either clad, plated, or coated with corrosion-resistant metals such as zinc, aluminum, or zinc-, aluminum-, nickel- or iron-based alloys, whether or not corrugated or painted, varnished, laminated, or coated with plastics or other non-metallic substances in addition to the metallic coating." *Certain Corrosion-Resistant Steel Products From Taiwan: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 81 Fed. Reg. 35,313, 35,315 (Int'l Trade Admin. June 2, 2016).

## I. BACKGROUND

### A.  The Parties in this Litigation

Plaintiffs Prosperity Tieh Enterprise Co., Ltd. ("Prosperity") and Yieh Phui Enterprise

Co. Ltd. ("Yieh Phui") are Taiwanese producers and exporters of CORE.  AK Steel Corporation,

Nucor Corporation, Steel Dynamics, Inc., California Steel Industries, Inc., ArcelorMittal USA

LLC, and United States Steel Corporation were petitioners in the investigation and are each

defendant-intervenors in this consolidated action (together, the "defendant-intervenors").

### B.  The Contested Decision

Challenged in this litigation is *Certain Corrosion-Resistant Steel Products From India,*

*Italy, the People's Republic of China, the Republic of Korea and Taiwan: Amended Final*

*Affirmative Antidumping Determination for India and Taiwan, and Antidumping Duty Orders*,

81 Fed. Reg. 48,390 (Int'l Trade Admin. July 25, 2016) ("*Amended Final Determination*").  The

Amended Final Determination modified the Department's decision in *Certain Corrosion-*

*Resistant Steel Products From Taiwan: Final Determination of Sales at Less Than Fair Value*

*and Final Affirmative Determination of Critical Circumstances, in Part*, 81 Fed. Reg. 35,313

(Int'l Trade Admin. June 2, 2016) ("*Final Determination*").  The period of investigation ("POI")

was April 1, 2014 through March 31, 2015.  *Id*. at 35,313.

### C.  Proceedings before Commerce

A petition filed in June 2015 sought an antidumping duty order on imports of CORE

from Italy, India, China, Korea, and Taiwan.  *See Certain Corrosion-Resistant Steel Products*

*From Italy, India, the People's Republic of China, the Republic of Korea, and Taiwan: Initiation*

*of Less-Than-Fair-Value-Investigations*, 80 Fed. Reg. 37,228 (Int'l Trade Admin.

June 30, 2015).  Following initiation, Commerce selected Yieh Phui and Prosperity as the

Taiwanese mandatory respondents for individual investigation. *Selection of Respondents for the Antidumping Duty Investigation on Certain Corrosion-Resistant Steel Products from Taiwan* at 4 (July 20, 2015) (P.R. Doc. 62).[3]

Commerce published a preliminary determination on CORE from Taiwan on January 4, 2016. *See Certain Corrosion-Resistant Steel Products from Taiwan: Negative Preliminary Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 72 (Int'l Trade Admin. Jan. 4, 2016) ("*Prelim. Determination*"); *see also Decision Memorandum for the Preliminary Determination in the Antidumping Duty Investigation of Certain Corrosion-Resistant Steel Products from Taiwan*, A-583-856, (Dec. 22, 2015) (P.R. Docs. 262-263), *available at* https://enforcement.trade.gov/frn/summary/taiwan/2015-32761-1.pdf (last visited Jan. 18, 2018) ("*Prelim. Decision Mem.*").  In the Preliminary Determination, Commerce treated Yieh Phui and Synn Industrial Co., Ltd. ("Synn") as a single entity (the "Yieh Phui/Synn" entity).[4] *Prelim. Decision Mem.* at 4.  Commerce did not include Prosperity within the Yieh Phui/Synn entity.  *Id*.  Commerce calculated a preliminary zero percent dumping margin for both Prosperity and the Yieh Phui/Synn entity and preliminarily determined that CORE from Taiwan was not being, and is not likely to be, sold in the United States at less than fair value.  *Prelim. Determination*, 81 Fed. Reg. at 72-73.

---

[3] While the court relies only on public documents (including public versions of business proprietary, *i.e.*, "confidential" documents) in this Opinion and Order, citations are provided to both the public and business proprietary versions of the cited document where possible.  Public documents are identified by "P.R. Doc. __."  Confidential documents are identified by "C.R. Doc. __."

[4] Synn Industrial Co., Ltd. ("Synn") is a Taiwanese producer of subject merchandise. Synn did not make any export sales to the United States during the period of investigation. *Commerce's Sales Verification Report for Synn* at 7 (Apr. 13, 2016) (P.R. Doc. 345) (C.R. Doc. 571) ("*Sales Verification Rep. for Synn*").

In the Final Determination, Commerce found that CORE from Taiwan was being, or was likely to be, sold in the United States at less than fair value. *Final Determination*, 81 Fed. Reg. at 35,313; *see also Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Certain Corrosion-Resistant Steel Products from Taiwan*, A-583-856, (May 26, 2016) (P.R. Doc. 372), *available at* https://enforcement.trade.gov/frn/summary/taiwan/2016-12975-1.pdf (last visited Jan. 18, 2018) ("*Final Decision Mem.*").  In reaching this determination, Commerce treated Yieh Phui, Prosperity, and Synn as a single entity (the "Yieh Phui/Prosperity/Synn" entity).  *Final Determination*, 81 Fed. Reg. at 35,314; *Final Decision Mem.* at 24-28.  In the Final Determination, Commerce declined to make downward adjustments to Yieh Phui's and Synn's home market sales prices to account for certain rebates granted to their respective home market customers.  *Final Decision Mem*. at 20-24.  Commerce further determined that Prosperity failed to report properly the yield strength of certain sales of CORE and applied facts otherwise available, with an adverse inference, to the costs of the sales found to have been misclassified. *Id*. at 11-19.  Commerce assigned the Yieh Phui/Prosperity/Synn entity a weighted-average dumping margin of 3.77%.  *Final Determination*, 81 Fed. Reg. at 35,314.

Following a ministerial error allegation, Commerce published an amended final determination that increased the weighted-average dumping margin assigned to the Yieh Phui/Prosperity/Synn entity from 3.77% to 10.34%.  *Amended Final Determination*, 81 Fed. Reg. at 48,391, 48,393.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

The court exercises jurisdiction according to section 201 of the Customs Courts Act of 1980, *as amended*, 28 U.S.C. § 1581(c), which provides the court jurisdiction to review a final affirmative determination of sales at less than fair value in an action brought under section 516A(a)(2) of the Tariff Act of 1930 (the "Tariff Act"); *see* 19 U.S.C. §§ 1516a(a)(2)(A), (a)(2)(B)(i).[5]  In reviewing a final determination, the court will hold unlawful any finding, conclusion, or determination not supported by substantial record evidence or otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

### B.  Commerce Unlawfully Failed to Adjust the Prices in Home Market Sales for Rebates

Commerce determines an antidumping duty margin by comparing the normal value of the subject merchandise to the export price (or constructed export price) at which the subject merchandise is sold in the United States.  19 U.S.C. § 1673.  Normal value ordinarily is determined from the "price at which the foreign like product is first sold . . . for consumption in the exporting country," with certain adjustments.  *Id*. § 1677b(a)(1)(B).  In pertinent part, the Department's regulation, 19 C.F.R. § 351.401(c), provides as follows:

> *Use of price net of price adjustments*.  In calculating export price, constructed export price, and normal value (where normal value is based on price), the Secretary will use a price that is net of any price adjustment, as defined in § 351.102(b), that is reasonably attributable to the subject merchandise or the foreign like product (whichever is applicable).

---

[5] All citations to the United States Code herein are to the 2012 edition and all citations to the Code of Federal Regulations herein are to the 2016 edition.

19 C.F.R. § 351.401(c). "'Price adjustment' means any change in the price charged for subject

merchandise or the foreign like product, such as discounts, rebates and post-sale price

adjustments, that are [*sic*] reflected in the purchaser's net outlay." 19 C.F.R. § 351.102(b)(38).

 Yieh Phui and Synn provided their home market customers what they called "quantity

rebates" or "purchase rewards rebates." The terms and conditions for these rebates were not

established prior to the time of sale. Rather, Yieh Phui and Synn would consider, on a

customer-by-customer basis, the total quantity shipped, market conditions, and the potential for

future orders in determining the rebates.

 Yieh Phui claims that Commerce violated 19 C.F.R. § 351.401(c) when it failed to make

corresponding downward adjustments in the starting prices Commerce used in determining

normal value, *i.e.*, the prices at which Yieh Phui and Synn sold the foreign like product in its

home market. Mem. of P. & A. in Supp. of Pl. Yieh Phui Enterprise Co., Ltd.'s Rule 56.2 Mot.

for J. on the Agency R. 1-15 (Dec. 15, 2016), ECF Nos. 52 (conf.), 53 (public) ("Yieh Phui's

Br."); Reply Br. of Pl. Yieh Phui Enterprise Co., Ltd. 2-7 (May 24, 2017), ECF No. 67 ("Yieh

Phui's Reply Br."). According to Yieh Phui, Commerce acted contrary to the plain meaning of

the pertinent regulations and improperly required it to "prove customer knowledge of an

adjustment at any particular point relative to the date of sale." Yieh Phui's Br. 8. For the

reasons discussed below, the court finds merit in this claim.

 In the Final Determination, Commerce disallowed monthly home market rebates reported

by Yieh Phui and Synn. *Final Decision Mem.* at 20-24. Commerce based this conclusion, in

part, on its finding that the terms of these rebates "were not fixed at or before the date of sale."

*Id*. at 21. Commerce explained that the Department "only adjust[s] normal value to account for

rebates when the terms and conditions of the rebate are known to the customer prior to the sale

and the claimed rebates are customer-specific." *Id.*  Commerce also based its decision to reject

Yieh Phui's and Synn's reported rebate adjustments on a finding that these rebates were issued

with the purpose of limiting antidumping duty liability. *Id.* at 21-22.  In the Final Decision

Memorandum, Commerce also indicated its disagreement with this Court's holding in

*Papierfabrik August Koehler AG v. United States*, 38 CIT __, 971 F. Supp. 2d 1246 (2014)

("*Koehler*"). *Id.* at 22.  In *Koehler*, this Court, interpreting 19 C.F.R. § 351.102(b)(38),

disallowed the Department's rejection of certain price adjustments on the premise that the

respondent's customers lacked knowledge of the terms and conditions of the rebates at the time

of sale. *Koehler*, 38 CIT at __, 971 F. Supp. 2d at 1259.  In the Final Decision Memorandum,

Commerce opined "that *Koehler* conflicts with other CIT decisions that affirmed the

Department's positions to reject claims for price adjustments." *Final Decision Mem.* at 22

(citations omitted).

        In this case, Commerce did not reach a finding that the rebates reported by Yieh Phui and

Synn were not actually paid to the companies' home market customers.  Commerce did not

question that the rebates were actually "reflected in the purchaser's net outlay," *see* 19 C.F.R.

§ 351.102(b)(38), or whether the rebates were "reasonably attributable" to sales of the "foreign

like product" within the meaning of 19 C.F.R. § 351.401(c). *See Final Decision Mem.* at 20-24.

To the contrary, Commerce verified the home market rebates reported by Yieh Phui and Synn

and found no discrepancies or inconsistencies with the rebate information reported. *Verification*

*of the Sales Responses of Yieh Phui Enterprise Co., Ltd.* at 10 (Apr. 14, 2016) (P.R. Doc. 343)

(C.R. Doc. 569); *Verification of the Sales Responses of Synn Industrial Co., Ltd.* at 11

(Apr. 13, 2016) (P.R. Doc. 345) (C.R. Doc. 571).

On their face, the regulations require Commerce to recognize a reduction in the

purchaser's net outlay for the foreign like product that satisfies the definition of a "price

adjustment" in § 351.102(b)(38).  19 C.F.R. § 351.401(c) ("In calculating . . . normal value

(where normal value is based on price), the Secretary *will use* a price that is net of *any* price

adjustment, as defined in § 351.102(b) . . . ." (emphasis added)).  As Yieh Phui notes, "[t]he

regulations state that Commerce 'will' (not 'may') use U.S. and comparison market prices net of

'*any* price adjustment' so long as the adjustment is reasonably attributable to the subject

merchandise (or the foreign like product) and falls within the 'price adjustment' definition."

Yieh Phui's Br. 7 (emphasis in original).  Giving as examples "discounts, rebates and post-sale

price adjustments," the regulations set forth a broad definition of "price adjustment"

encompassing "any change in the price charged for . . . the foreign like product" that "are

reflected in the purchaser's net outlay."  19 C.F.R. § 351.102(b)(38).  In the situation presented

here, § 351.401(c) did not permit Commerce to use a home market price for the foreign like

product that was *not* net of a price adjustment satisfying the § 351.102(b)(38) definition.

In reaching the opposite conclusion, Commerce made a number of irrelevant findings,

including that the terms of Yieh Phui's and Synn's home market rebates "were not established

prior to shipment and invoicing."  *Final Decision Mem*. at 24.  Similarly irrelevant is the

Department's finding that neither company had any "established standards or policies, written or

unwritten, that specify the amount and the possibility" of rebates.  *Id*. at 23-24.  The

Department's finding that the home market rebates "could not have issued . . . without

[antidumping] duty liability in mind" is also extraneous and irrelevant.  *Id*. at 23.  These findings

are all directed to the wrong question.  Under the regulations, the question is not whether the

rebates were made according to a "program" that satisfied the various prerequisites Commerce

identified in the Final Decision Memorandum, or whether they were made for a reason

acceptable to Commerce, but whether the monthly rebates were actually reflected in purchasers'

net outlays.

In reaching conclusions from its findings, the Department's reasoning is erroneous in

several respects.  First, the Final Decision Memorandum misapplies the Department's

regulations in declining to adjust the home market prices for the monthly rebates.  As discussed

above, Commerce did not conclude that the monthly rebates were not "reflected in the

purchaser's net outlay" within the meaning of § 351.102(b)(38) or that the rebates were not

"reasonably attributable to the . . . foreign like product" within the meaning of § 351.401(c).  In

addition, as the court has pointed out, Commerce successfully verified that the monthly rebates

issued by Yieh Phui and Synn were in fact paid to home market customers.  In the circumstances

presented by the Department's own findings, the regulations require Commerce to treat these

rebates as post-sale price adjustments.  Although § 351.401(b) provides that "[t]he interested

party that is in possession of the relevant information has the burden of establishing to the

satisfaction of the Secretary the amount and nature of a particular adjustment," Commerce was

not empowered by this general provision, which applies to all adjustments, not merely price

adjustments, to ignore the specific standard established by § 351.401(c), according to which the

Secretary must recognize a "price adjustment" as defined in § 351.102(b)(38).  Here, Commerce

made no findings stating or suggesting that the price adjustments did not occur.

The Final Decision Memorandum also misconstrues the Department's discussion of its

regulations in the preamble that accompanied promulgation of the regulations at issue (the

"Preamble").  *See Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,344

(Int'l Trade Admin. May 19, 1997) ("*Final Rule*").  Contrary to defendant's argument, the

Preamble does not support a regulatory interpretation under which Commerce was free to

disregard rebates such as those at issue in this case.  Rather, the pertinent discussion in the

Preamble reveals that in promulgating the final rule Commerce intended for reductions,

including post-sale reductions, in the price of the foreign like product to result in adjustments to

the starting prices used to determine normal value if they are reflected in the purchaser's net

outlay.

    The Preamble explained that § 351.401(c) "restated the Department's practice with

respect to price adjustments, such as discounts and rebates." *Final Rule*, 62 Fed. Reg. at 27,344.

In proposing § 351.401, Commerce described the Department's practice as follows: "Under

paragraph (c), the Department will continue its practice of adjusting reported gross prices for

discounts, rebates and certain post-sale adjustments to price that affect the net price."

*Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308, 7,329 (Int'l Trade Admin.

Feb. 27, 1996) (notice of proposed rulemaking).

    The Preamble further explained that Commerce took "several steps aimed at alleviating"

confusion concerning the proposed § 351.401(c), and price adjustments generally, that

Commerce believed to have been reflected in the comments to the proposed rule.  *Final Rule*,

62 Fed. Reg. at 27,344.  The Preamble explained that the Department included in the

promulgated § 351.102 a new definition of the term "price adjustment."  *Id.*  Concerning the

term "price adjustment" and its definition, the Preamble adds that "[t]his term is intended to

describe a category of changes to a price, such as discounts, rebates and post-sale price

adjustments, that affect the net outlay of funds by the purchaser" and that "such price

changes . . . are changes that the Department *must take into account* in identifying the actual

starting price."  *Id*. at 27,300 (emphasis added).  This Preamble discussion, like the regulation

itself, makes clear that Commerce intended to apply a uniform definition of "price adjustment"

when determining a starting price for calculating normal value.  *Id.*

      The Final Decision Memorandum misconstrues the language and the intent of the

Preamble in concluding that "[w]hile the Department's regulations provide for post-sale price

adjustments that are reasonably attributable to the subject merchandise, the Preamble indicates

that exporters or producers should not be allowed 'to eliminate dumping margins by providing

price adjustments 'after the fact.''"  *Final Decision Mem.* at 21-22 (quoting *Final Rule*, 62 Fed.

Reg. at 27,344).  The passage in the Preamble from which the Final Decision Memorandum drew

this conclusion reads as follows:

> One commenter suggested that, at least for purposes of normal value, the
> regulations should clarify that the only rebates Commerce will consider are ones
> that were contemplated at the time of sale.  This commenter argued that foreign
> producers should not be allowed to eliminate dumping margins by providing
> "rebates" only after the existence of margins becomes apparent.
>
> The Department has not adopted this suggestion at this time.  We do not
> disagree with the proposition that exporters or producers will not be allowed to
> eliminate dumping margins by providing price adjustments "after the fact."
> However, as discussed above, the Department's treatment of price adjustments in
> general has been the subject of considerable confusion.  In resolving this
> confusion, we intend to proceed cautiously and incrementally.  The regulatory
> revisions contained in these final rules constitute a first step at clarifying our
> treatment of price adjustments.  We will consider adding other regulatory
> refinements at a later date.

*Final Rule*, 62 Fed. Reg. at 27,344.  No substantive amendments were made to the text of

§ 351.401(c) or § 351.102(b)(38) between the promulgating of the final rule in 1997 and the

investigation at issue.[6]  When read in the entirety and in conjunction with the Department's

---

[6] Following the decision in *Papierfabrik August Koehler AG v. United States*, 38 CIT __,
971 F. Supp. 2d 1246 (2014), Commerce amended its regulations.  *See Modification of
Regulations Regarding Price Adjustments in Antidumping Duty Proceedings*,
81 Fed. Reg. 15,641 (Int'l Trade Admin. Mar. 24, 2016).  The amended regulations alter
(continued . . .)

regulations, the Preamble does not support the reasoning by which Commerce disregarded Yieh Phui's and Synn's monthly rebates.

Before the court, defendant and defendant-intervenors make a number of arguments in support of the Department's exclusion of Yieh Phui's and Synn's home market rebates, most of which parallel the erroneous reasoning of the Final Decision Memorandum. *See* Def.'s Opp'n to Pl.'s and Consolidated Pl.'s Mots. for J. upon the Agency R. 45-58 (Apr. 26, 2017), ECF Nos. 63 (conf.), 66 (public) ("Def.'s Opp'n"); Resp. Br. of Def.-Ints. in Opp'n to Pls.' Mot. for J. on the Agency R. 34-39 (Apr. 26, 2017), ECF Nos. 64 (conf.), 65 (public) ("Def.-Ints.' Opp'n"). First, defendant argues that the Department's regulations do not define the term "rebates" and that, accordingly, it is free to develop a reasonable interpretation to fill this gap. Def.'s Opp'n 50-51. This argument is specious because the definition of the term "rebate" is not the issue in this case. The applicable regulation, 19 C.F.R. § 351.401(c), left no room for interpretation in requiring downward adjustments to the starting price for normal value for any "price adjustment" made to the home market price of the foreign like product within the meaning of 19 C.F.R. § 351.102(b)(38). The latter provision defined "price adjustment" broadly and directly contrary to the interpretation Commerce advanced in the Final Decision Memorandum. *See* 19 C.F.R. § 351.102(b)(38) ("'Price adjustment' means *any* change in the price charged for subject merchandise or the foreign like product, *such as* discounts, rebates and post-sale price adjustments, *that are reflected in the purchaser's net outlay*.") (emphasis added). Whether or

---

(. . . continued)

§ 351.102(b)(38) and § 351.401(c) to state that the Department will not accept a price adjustment that is made after the time of sale "unless the interested party demonstrates, to the satisfaction of the Secretary, its entitlement to such an adjustment." *Id.* at 15,645-46. The amended regulations do not apply to the investigation that gave rise to this action.

not Commerce considers the post-sale price adjustments at issue in this case to be "rebates" is
irrelevant to the question presented.

Next, defendant and defendant-intervenors argue that Yieh Phui's reliance on this Court's
decision in *Koehler* is incorrect.  Def.'s Opp'n 52-54; Def.-Ints.' Opp'n 36.  Before the court,
Yieh Phui relies on *Koehler* to support its argument that Commerce acted unlawfully in failing to
make downward adjustments in the starting prices Commerce used to determine normal value.
Defendant and defendant-intervenors assert that *Koehler* conflicts with other decisions and that it
was wrongly decided.  Def.'s Opp'n 52-54; Def.-Ints.' Opp'n 36.  In arguing that *Koehler*
conflicts with other decisions, defendant directs the court to a pair of cases that were considered
in *Koehler*.  Def.'s Opp'n 53-54 (citing *Koening & Bauer-Albert AG v. United States*,
22 CIT 574, 15 F. Supp. 2d 834 (1998), *aff'd in part*, *vacated on other grounds*, 259 F.3d 1341
(Fed. Cir. 2001) and *Nachi-Fujikoshi Corp. v. United States*, 19 CIT 914,
890 F. Supp. 1106 (1995)).  As explained in *Koehler*, both *Koening & Bauer-Albert AG* and
*Nachi-Fujikoshi Corp.* arose from administrative determinations made prior to the June 18, 1997
effective date of the final rule that instituted the versions of § 351.401(c) and § 351.102(b)(38)
that are at issue in this action.  *See Koehler*, 38 CIT at __, 971 F. Supp. 2d at 1256.  The court
notes that the Department's interpretation of the relevant regulations is also inconsistent with this
Court's opinion in *Tension Steel Industries Co., Ltd. v. United States*, 40 CIT __, 179 F. Supp.
3d 1185 (2016).  *See also Tension Steel Indus. Co., Ltd. v. United States*, 41 CIT __,
236 F. Supp. 3d 1361 (2017), *appeal docketed*, No. 17-2526 (Fed. Cir. Nov. 8, 2017).

Because the Department's decision in the Final Determination not to make downward
adjustments to Yieh Phui's and Synn's home market sales prices to account for rebates granted

to their home market customers violated its own regulations, Commerce must correct this error

in the redetermination it reaches in response to this Opinion and Order.

C.  The Department's Determination to "Collapse" Prosperity with the Yieh Phui/Synn Entity is
Based on Certain Findings Not Supported by Substantial Evidence

Prosperity and Yieh Phui challenge the Department's decision to treat Prosperity as a

single entity in combination with the Yieh Phui/Synn entity and thereby assign this entity a

single antidumping duty margin in the Final Determination.  Mot. of Pl. Prosperity Tieh

Enterprise Co., Ltd. for J. upon the Agency R. 1, 2-3, 13-14, 15-25 (Dec. 15, 2016), ECF Nos. 54

(conf.), 55 (public) ("Prosperity's Br."); Yieh Phui's Br. 1, 24-27; Pl. Prosperity Tieh's Reply in

Supp. of its Mot. for J. upon the Agency R. 2-9 (May, 25, 2017), ECF Nos. 71 (conf.), 72

(public) ("Prosperity's Reply Br."); Yieh Phui's Reply Br. 1-2, 11-13.  As explained below,

certain findings upon which Commerce relied in making the challenged decision are unsupported

by substantial evidence on the record.

Treating two related entities as a single entity is referred to colloquially as "collapsing,"

and is intended to address the possible manipulation of dumping margins by affiliated

companies.[7]  *See Viraj Grp. v. United States*, 476 F.3d 1349, 1356 (Fed. Cir. 2007).  The

Department's regulations permit Commerce to treat affiliated producers as a single entity "where

those producers have production facilities for similar or identical products that would not require

substantial retooling of either facility in order to restructure manufacturing priorities and the

Secretary concludes that there is a significant potential for the manipulation of price or

production."  19 C.F.R. § 351.401(f)(1).

---

[7] The Department's decision to "collapse" Yieh Phui Enterprise Co., Ltd. ("Yieh Phui")
with Synn is unchallenged.

Commerce discussed its decision in a "Collapsing Memorandum," in which it first

determined that Prosperity, Yieh Phui, and Synn were all affiliated within the meaning of section

771(33) of the Tariff Act, 19 U.S.C. § 1677(33).  *Final Affiliation and Collapsing Memorandum*

at 3-4 (June 2, 2016) (C.R. Doc. 595) (P.R. Doc. 379) ("*Collapsing Mem.*"); *see also Final*

*Determination*, 81 Fed. Reg. at 35,314; *Final Decision Mem.* at 24-28.[8]  The Department then

found that because Prosperity, Yieh Phui, and Synn each already manufactured merchandise

within the scope of the investigation, the producers have "production facilities for similar or

identical products and do not require substantial retooling of their facilities in order to restructure

manufacturing priorities."  *Collapsing Mem.* at 5-6 (citing 19 C.F.R. § 351.401(f)(1)).  No party

challenges these aspects of the Department's collapsing analysis.

Commerce next considered whether "a significant potential for the manipulation of price

or production" existed between the three companies.  *See* 19 C.F.R. § 351.401(f)(2).  The

Department's regulation lists three factors that may be considered in determining whether there

is a "significant potential for manipulation" of dumping margins by affiliated companies.  These

factors are:

    (i)      The level of common ownership;

    (ii)     The extent to which managerial employees or board members of one firm
              sit on the board of directors of an affiliated firm; and

    (iii)    Whether operations are intertwined, such as through the sharing of sales
              information, involvement in production and pricing decisions, the sharing
              of facilities or employees, or significant transactions between the affiliated
              producers.

---

[8] Commerce presented its analysis for its decision to combine Prosperity Tieh Enterprise
Co., Ltd. ("Prosperity") with the Yieh Phui/Synn entity in a separate memorandum, incorporated
by reference, because of the presence of business proprietary information.

19 C.F.R. § 351.401(f)(2).  This list of factors is non-exhaustive and reflects the Department's

position that collapsing determinations are highly fact-specific and are to be made on a

case-by-case basis.  *Final Rule*, 62 Fed. Reg. at 27,345-46.

      In evaluating the first factor identified in § 351.401(f)(2), the level of common

ownership, Commerce determined that a significant level of common ownership existed between

Prosperity and Synn based on Prosperity's having been a shareholder in Synn.  *Collapsing Mem.*

at 6-7.  Commerce rejected Prosperity's argument that this § 351.401(f)(2) factor weighed

against collapsing due to Prosperity's having sold its ownership interest in Synn subsequent to

the POI, noting that "the Department is obligated to consider information concerning

circumstances that existed and events that occurred only during the POI."  *Id.*

      Commerce next analyzed the second § 351.401(f)(2) factor, "the extent to which

managerial employees or board members of one firm sit on the board of directors of an affiliated

firm."  *Collapsing Mem.* at 7.  Commerce found that the service of Prosperity's chairman as one

of Synn's three board members constituted significant managerial overlap between Prosperity

and Synn during the POI.  *Id.*[9]

      Commerce then turned to the final factor in § 351.401(f)(2), the extent to which the

operations of Prosperity and Synn were intertwined.  *Collapsing Mem.* at 7.  Commerce detailed

the extent to which galvanizing services performed by Prosperity for Synn pursuant to a tolling

agreement accounted for Synn's overall production of CORE during the POI.  *Id.*  Commerce

further noted how this "tolling/galvanizing contract" granted Synn certain access to Prosperity's

books and records.  *Id.*  Next, Commerce detailed cold-rolling services that Synn performed for

---

[9] This information was treated as confidential at the administrative level.  However,
Prosperity's brief before the court discloses this information to the public.  *See* Prosperity's
Br. 18.

Prosperity pursuant to a purchase and sale agreement during the POI. *Id.* Commerce calculated the percentage that these cold-rolling services represented of the "overall cold-rolling services Synn Industrial provided to all customers." *Id.* Finally, Commerce noted the extent to which Synn's financial statements reflected sales to Prosperity and purchases from Prosperity during the POI. *Id.* at 8-9.

Commerce found that the "[t]olling arrangements and purchase and sale agreements between Prosperity Tieh and Synn Industrial [were] indicative" of intertwined operations. *Id.* at 7. Commerce concluded that Prosperity, "by means of ownership, overlapping management, and intertwined operations between itself and Synn Industrial, [was] in a position to manipulate price or production." *Id.* at 8.

Prosperity challenges the Department's decision to collapse Prosperity with the Yieh Phui/Synn entity by arguing, in part, that certain of the Department's "intertwined operations" findings are not supported by substantial evidence. Prosperity's Br. 21; Prosperity's Reply Br. 7-9. Prosperity points to record evidence that certain facts relied on by Commerce were based on data for calendar year 2014, rather than on data covering the POI (April 1, 2014 through March 31, 2015), as the Department had claimed. Prosperity's Br. 21; Prosperity's Reply Br. 7-9. Prosperity also highlights record evidence showing that the entirety of the cold-rolling services provided by Synn for Prosperity took place prior to the POI, rather than during it, as Commerce had concluded in the Collapsing Memorandum. Prosperity's Br. 21; Prosperity's Reply Br. 8.

Regarding the timing of the cold-rolling services that Synn performed for Prosperity, defendant admits that Commerce incorrectly stated in the Collapsing Memorandum that the cold-rolling services Synn provided for Prosperity occurred during the POI. Def.'s Opp'n 43

(acknowledging that "Prosperity is correct that this figure did not pertain to the period of investigation"). Defendant also acknowledges that the data detailing Synn's sales to Prosperity and its purchases from Prosperity were for calendar year 2014, rather than for the POI, as found by Commerce. *Id*. at 44. Defendant further acknowledges that had Commerce examined the purchases and sales that took place between Synn and Prosperity during the POI rather than during the 2014 calendar year, the significance, in percentage terms, of these purchases and sales "may have been lower." *Id*. at 44-45. While defendant acknowledges only that the significance of the purchases and sales "may have been lower during the overall period of investigation," *id*., record evidence demonstrates the purchases and sales between Synn and Prosperity were in fact less significant over the POI than over calendar year 2014. *See* Prosperity's Br. 21. Thus it cannot be said that using calendar year data, as opposed to POI data, had no potential to affect the final determination.

Defendant argues that, despite the errors it acknowledges, the court should rule that the substantial record evidence still supports the Department's collapsing determination. Def.'s Opp'n 33-45. Defendant argues that "even disregarding the information that was outside the period of investigation, there was significant evidence supporting intertwined operations on the record." *Id*. at 40-41 (citing *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987)). The court disagrees. Because this Court, like any court reviewing an agency action, must conduct its review according to the findings of fact and the reasoning the agency puts forth, the Department's collapsing decision cannot be sustained according to the applicable standard of review. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). Because the collapsing decision was based on erroneous findings of fact, the court must order Commerce to

reconsider that decision and reach a new determination based on findings that are supported by

substantial evidence on the record of the investigation.

    <u>D.  Commerce Applied Facts Otherwise Available, and an Adverse Inference, Based on an</u>
       <u>Invalid Finding that Prosperity Misclassified the Yield Strength of Certain CORE Sales</u>

       Through questionnaires issued during the investigation, Commerce sought to ascertain

the physical characteristics of the respondents' subject merchandise, including the yield strength

of each individual product.  *See generally Initial Antidumping Duty Questionnaire for Prosperity*

*Tieh Enterprise Co., Ltd.* at B-11 to B-12, C-9 to C-10 (Aug. 7, 2015) (P.R. Doc. 97); *see also*

*Memorandum Regarding Correction to Yield Strength Field of Initial Questionnaire*

(Aug. 14, 2015) (P.R. Doc. 102) ("*Yield Strength Mem.*").  Commerce used the reported physical

characteristics in applying product-specific model-matching criteria that it then used when

comparing U.S. price to normal value.

       Under section 776(a)(2) of the Tariff Act, 19 U.S.C. § 1677e(a)(2), Commerce is directed

generally to use "facts otherwise available in reaching the applicable determination under this

subtitle" if a party:

    (A)    withholds information that has been requested by the administering
            authority . . . under this subtitle,
    (B)    fails to provide such information by the deadlines for submission of the
            information or in the form and manner requested, subject to subsections
            (c)(1) and (e) of section 1677m of this title,
    (C)    significantly impedes a proceeding under this subtitle, or
    (D)    provides such information but the information cannot be verified as
            provided in section 1677m(i) of this title[.]

19 U.S.C. § 1677e(a)(2).  Relying upon clauses (B) and (D), Commerce found that Prosperity

failed to submit certain information within applicable time limits and failed to provide verifiable

information.  *Final Decision Mem.* at 18 ("Thus, we determine, based on our findings at the sales

verification, that PT [*i.e.*, Prosperity] failed to submit the requested information within the applicable time limits, and failed to provide information that could be verified.").[10]

This issue arose from the way in which Prosperity classified, within one of six categories defined in the Department's questionnaire, certain of its CORE products according to yield strength. *Id*. at 11-19. Commerce interpreted its own instructions to mean that respondents must classify products according to minimum yield strength as specified by an applicable industry standard, where one pertained to the product being reported. *See id*. at 13. The reporting of yield strength was to be in units of pounds per square inch ("psi"), converted where necessary. *See Yield Strength Mem.* at 1-2. At verification, Commerce found that Prosperity had misclassified certain of its products in reporting sales in the databases by placing these products in the wrong yield strength category. *Final Decision Mem*. at 13; *Verification of the Sales Responses of Prosperity Tieh Enterprise Co., Ltd.* at 9 (Apr. 13, 2016) (P.R. Doc. 341) (C.R. Doc. 568). Commerce found, further, that "[b]ecause the quantity and costs of the mix of products included in the weighted-average mix of the misreported CONNUMs [*i.e.*, control numbers] were incorrect, the reported cost was distorted for those CONNUMs." *Ministerial Error Memorandum Concerning the Final Determination in the Antidumping Duty Investigation of Certain Corrosion-Resistant Steel Products from Taiwan* at 1-2 (July 19, 2016)

---

[10] Commerce found that Synn also misreported yield strength for certain of its home market sales. *Final Decision Mem.* at 19; *Sales Verification Rep. for Synn* at 9. In the Final Determination, Commerce applied facts otherwise available with an inference adverse to Synn for the sales it found to have been misreported. *Final Decision Mem.* at 19. As facts otherwise available with an adverse inference, Commerce "assigned to Synn, in the cost database, the costs associated with the highest TOTCOM [*i.e.*, total cost of manufacturing] for certain sales in the group of incorrectly coded sales." *Id.* The issue of alleged misreporting by Synn is not before the court. Synn is not a party to this action, and neither Prosperity nor Yieh Phui challenged the Department's decision to apply facts otherwise available with an adverse inference to Synn's home market sales that Commerce found to have been improperly reported.

(P.R. Doc. 386) ("*Ministerial Error Mem.*"); *see also Final Decision Mem.* at 19 (explaining that

"because the costs for the CONNUMs with '6' and '7' minimum specified yield strengths are

incorrectly comingled, we lack the information necessary to recode the costs for the miscoded

group of CONNUMs").

Commerce additionally found that Prosperity did not cooperate to the best of its ability in

responding to the Department's information request and, based on that finding, used an adverse

inference under 19 U.S.C. § 1677e(b) in selecting from the facts otherwise available.  *Final*

*Decision Mem.* at 19.  As an adverse inference, Commerce assigned, in the cost database, the

costs associated with the highest variable and total cost of manufacturing from the population of

all CONNUMs affected by the alleged misclassification as substitute information in calculating

the weighted-average dumping margin.  *Id.*; *Ministerial Error Mem.* at 5.

Before the court, Prosperity claims that the Department's finding that Prosperity

misclassified the yield strength of certain sales of CORE is not supported by substantial

evidence.  Prosperity's Br. 25-29; Prosperity's Reply Br. 10-16.  Prosperity argues that

Commerce, therefore, did not have authority under 19 U.S.C. § 1677e(a)(2) to use facts

otherwise available or an adverse inference.  Prosperity's Br. 32-43; Prosperity's Reply

Br. 20-23.  Prosperity contends that it permissibly interpreted the Department's instructions to

allow it to classify each of its CORE products according to one of its own internal specifications

for yield strength.  Prosperity's Br. 26-29; Prosperity's Reply Br. 11-16.  Prosperity submits that

it took this approach whenever an internal minimum specification for yield strength existed in its

Product Coding System, rather than a yield strength minimum specified by a standards

organization.  Prosperity's Reply Br. 10.  According to Prosperity, the only instances in which it

did not use the yield strength as specified in its own internal Product Coding System was where

its internal system did not specify a minimum yield strength.  *Id.*  Prosperity states that in those

instances it reported the yield strength using the minimum yield strength specified in a standard

to which the product conformed, as set by an international standards organization.  *Id.*

  Responding to the Department's questionnaire, Prosperity submitted information

regarding its U.S. market and home market sales of CORE.  *See Prosperity Tieh Enterprise Co.,*

*Ltd.'s Sections B-D Questionnaire Responses* (Oct. 14, 2015) (P.R. Docs.136-40)

(C.R. Docs. 95-113).  In its questionnaire responses, Prosperity explained the Product Coding

System that it used in the normal course of business.  *Id.* at B-10 to B-11, C-6 to C-7 (explaining

that the Product Coding System is used to designate various product characteristics, including the

mechanical characteristics (such as yield strength), of Prosperity's production).[11]  Prosperity also

stated that "the yield strength of the subject merchandise sold in each home market sale has been

reported in the 'CSTRENH' [*i.e.*, yield strength] field in the home market database, in

accordance with the above methodology [*i.e.*, the Yield Strength Memorandum]."  *Id.* at B-17

to B-18; *see also id.* at C-13 to C-14 (reporting yield strength of U.S. market sales in the same

fashion).  Prosperity provided Commerce, pursuant to the Department's instructions, a computer

file and print out detailing Prosperity's U.S. and home market sales during the POI.  *See id.*

at Ex. B-1 (Prosperity's home market sales file layout and sample print).

1.  Record Evidence Does Not Support the Department's Finding that Prosperity Misreported the
        Yield Strength of Certain Sales of CORE

  Resolving the issue before the court requires examination of the instructions Commerce

issued to Prosperity to ascertain whether the Department's factual finding that Prosperity

---

[11] Prosperity submitted for the record a copy of its Product Coding System in its
Section A questionnaire responses.  *Prosperity Tieh Enterprise Co., Ltd.'s Section A*
*Questionnaire Responses* at Ex. A-24 (Sept. 16, 2015) (P.R. Docs. 121-22) (C.R. Docs. 43-63).

"misreported" yield strength is a valid one, *i.e.*, one supported by substantial record evidence.

The court concludes that it is not a valid finding.  The Department's instructions do not preclude

a respondent from reporting (*i.e.*, "coding") yield strength according to manufacturer's

specifications rather than an external, established industry standard.  To illustrate this point, the

court sets forth below the instructions Commerce issued pertaining to the reporting of yield

strength and analyzes each paragraph therein.

**FIELD NUMBER 3.7:         YIELD STRENGTH**

FIELD NAME:  CSTRENH/U

DESCRIPTION:        Yield Strength

1 = Minimum specified yield strength under 25,000 psi

3 = Minimum specified yield strength of >= 25,000 psi but < 35,000 psi

4 = Minimum specified yield strength of >= 35,000 psi but <= 50,000 psi

5 = Minimum specified yield strength of > 50,000 psi but < 65,000 psi

6 = Minimum specified yield strength of >= 65,000 psi but <= 80,000 psi

7 = Minimum specified yield strength over 80,000 psi

For example, under ASTM A1079, the minimum specified yield strength for "Designation CP grade 780T/500Y" is 500 MPa, which converts to approximately 72,519 psi, so for that product, you would report code "6."

Where no minimum yield strength is required, but a typical minimum is identified within the specification from a standards organization such as ASTM (e.g., under ASTM A653, the typical range of yield strengths for "Designation CS Type A" is identified as 25,000 psi to 55,000 psi, yielding a typical minimum of 25,000 psi, which in turn falls under reporting code "3").

If no such requirements or guidance on minimum specified yield strength is identified in the specification for the product in question, explain in detail your rationale for using one of the above reporting codes to report this field for the product (do not create additional reporting codes).

> Finally, provide a chart that identifies all of the specifications/grades/
> types/designations in your comparison market and U.S. market sales
> databases. After identifying in the first column the complete
> specification/grade/type/designation identification (*e.g.*, "ASTM A653
> Designation SS grade 230"), identify in subsequent columns the allowable
> range of carbon content, the minimum specified yield strength (in pounds
> per square inch), the minimum specified tensile strength (in pounds per
> square inch), and the minimum specified elongation percentage. For those
> values in this chart that are based on non-mandatory guidance provided in
> the specification (such as for the minimum yield strength for the ASTM
> A653 CS Type A products referenced above), place three asterisks next to
> the value in question (*e.g.*, "25,000***").

*Yield Strength Mem.* at 1-2.[12] The fault Commerce found with Prosperity's reporting was

confined to a group of sales of CORE that Prosperity classified as code 7 based on the above

instructions ("Minimum specified yield strength over 80,000 psi") instead of code 6 ("Minimum

specified yield strength of >= 65,000 psi but <= 80,000 psi"), which Commerce believed was the

correct response.[13] *Final Decision Mem.* at 13. Commerce found that this occurred where the

CORE at issue had a minimum specified yield strength of exactly 80,000 psi, when yield

strength was determined according to the specifications in an established international standard.

*Id.* (concluding that the misreporting of minimum specified yield strength occurred "at the cusp

of the CONNUM cutoff"). The sales Commerce found to have been misreported as code 7

involved merchandise classified in Prosperity's internal Product Coding System as having a

---

[12] Seven days after the Initial Antidumping Questionnaire was issued to Prosperity, Commerce issued the Yield Strength Memorandum, which made a minor revision to the table on yield strength. *See Memorandum Regarding Correction to Yield Strength Field of Initial Questionnaire* (Aug. 14, 2015) (P.R. Doc. 102). The revision does not affect the court's analysis.

[13] The industry specifications pertaining to the CONNUMs that Commerce determined were incorrectly classified in code 7 instead of code 6 were AS1397/G550, ASTM A653/SS80, ASTM A755/SS80, ASTM A792/SS80, ASTM A792/SS80Cl, and ASTM A792M/SS550. *See Ministerial Error Memorandum Concerning the Final Determination in the Antidumping Duty Investigation of Certain Corrosion-Resistant Steel Products from Taiwan* at 1 (July 19, 2016) (P.R. Doc. 386).

mechanical property grade of "Structural (YS>80 Ksi)," *i.e.*, as having a minimum specified yield strength *greater* than 80,000 psi.  *See* Prosperity's Br. 9-11, 27-28.

The first problem with the Department's misclassification finding is that Commerce did not define in its questionnaire the meaning of the term "Minimum specified yield strength" as used in its table of yield strength categories ("codes").  *See Yield Strength Mem.* at 1-2.  As a result, this term could be read to refer to the yield strength as "specified" by the manufacturer or as "specified" by a standards organization.  Second, the four paragraphs that follow do not narrow the meaning of the term "Minimum specified yield strength" in the way that Commerce assumed.  The court is not aware of any other record information that did so, and defendant points to none.

The first paragraph that follows the table consists of a single sentence:  "For example, under ASTM A1079, the minimum specified yield strength for 'Designation CP grade 780T/500Y' is 500 MPa, which converts to approximately 72,519 psi, so for that product, you would report code '6'."  *Yield Strength Mem.* at 2.  While this sentence refers to an industry standard, ASTM A1079, it does so only as an example, not as a directive to classify products using only yield strength specifications obtained from industry standards.  Instead, the example is directed to the conversion of MPa (megapascals) to pounds per square inch.  The sentence does not state that only the use of yield strength specifications in established international industry standards, not manufacturer's specifications, are acceptable.

The second paragraph fails to communicate that only external standards will suffice because it is not even a complete sentence.  *See id.* ("Where no minimum yield strength is required, but a typical minimum is identified within the specification from a standards organization such as ASTM (e.g., under ASTM A653, the typical range of yield strengths for

'Designation CS Type A' is identified as 25,000 psi to 55,000 psi, yielding a typical minimum of

25,000 psi, which in turn falls under reporting code '3')."). Even were the court to overlook the

grammatical problem, it still would conclude that the text does not address the question this case

poses. The example in the parenthetical addresses how to report a "typical minimum" yield

strength where only a "typical range," and not an identified required minimum yield strength, is

given. There is no discussion of what constitutes a permissible specification within the universe

of possible specifications.

The third paragraph, a single sentence, instructs that "[i]f no such requirements or

guidance on minimum specified yield strength is identified in the specification for the product in

question, explain in detail your rationale for using one of the above reporting codes to report this

field for the product (do not create additional reporting codes)." *Id*. This sentence is directed to

a situation in which a product specification contained no minimum yield strength specification or

guidance. Here, minimum yield specifications existed in the manufacturer's specification and

that of the industry standard, and, therefore, this sentence is inapplicable to, and does not resolve,

the issue before the court. Moreover, in using the unspecific phrase "identified in the

specification for the product in question," the sentence suggests that Commerce intended a broad

meaning to the word "specification."

The fourth and final paragraph contains two references to industry standards, but each

reference is presented only as an example. *See id*. Like the preceding paragraphs, it does not

indicate an intent to prohibit a respondent from using a manufacturer's specification for yield

strength.

It might be argued that the examples given in the fourth paragraph and the first two

paragraphs suggest that only specifications published by international standards bodies were

intended.  But even if that interpretation of the instructions were considered, *arguendo*, to be the

more reasonable interpretation, it would not suffice to justify the adverse action Commerce took

against Prosperity.  The lack of specificity arising from the breadth of the terms Commerce used

(*e.g.*, "Minimum specified yield strength" and "specification for the product in question") and

from the absence of definitions for those terms convinces the court that Prosperity's

interpretation of the Department's reporting instructions was not unreasonable.  It follows that

Commerce, on this record, was not justified in resorting to the use of the facts otherwise

available.  Having not requested yield strength information only in the form of yield strength as

specified by a standards organization, Commerce was not supported by substantial evidence on

the record when it found, per 19 U.S.C. § 1677e(a)(B), that Prosperity failed to provide requested

yield strength information.  For the same reason, Commerce could not permissibly find that the

information Prosperity submitted "could not be verified" within the meaning of 19 U.S.C.

§ 1677e(a)(D).  Because the decision to resort to the facts otherwise available was incorrect, so

too was the decision to invoke an adverse inference based on an alleged failure by Prosperity "to

cooperate by not acting to the best of its ability to comply with a request for information" from

Commerce, *id*. § 1677e(b).  Simply stated, Prosperity complied with the instructions as

Commerce wrote them.

      The Department's reasoning that Prosperity could have consulted Commerce for

clarification of the information request, *see Final Decision Mem.* at 13, does not convince the

court that Commerce acted properly in using the facts otherwise available or an adverse

inference.  Because Commerce did not effectuate in its instructions its claimed intention to

confine yield strength reporting to yield strength specifications in established industry standards,

Prosperity did not act unreasonably in interpreting the Department's instructions to allow it to use manufacturer's specifications for this purpose or in not requesting clarification.

Defendant-intervenors argue, similarly, that Prosperity was "at the very least negligent" by "failing to confirm its understanding" of the instructions for reporting yield strength with Commerce and that it was Prosperity's "responsibility to look behind its internal product coding system and report physical characteristics for each sale based on Commerce's model match." Def.-Ints.' Opp'n 30.  Because the instructions on their face did not require Prosperity to code its products for yield strength based on an established industry standard, the court rejects defendant-intervenors' notion that Prosperity was required in this circumstance to seek clarification.  If Commerce is to take an action adverse to a party for an alleged failure to comply with an information request, it must fulfill its own responsibility to communicate its intent in that request.  In this instance, the possibility that a respondent would not interpret the instructions according to the Department's subjective and undisclosed intent was a foreseeable consequence of the way Commerce drafted those instructions.

Defendant and defendant-intervenors argue that the Department's instructions did not permit Prosperity to use producer-specific codes for reporting yield strength.  Def.'s Opp'n 18-24; Def.-Ints.' Opp'n 13-15, 16-18.  According to defendant-intervenors, the Department's questionnaire "instructions very clearly require[d] the reporting of MSYS [*i.e.*, minimum specified yield strength] based on industry specifications published by 'standards organizations such as ASTM.'"  Def.-Ints.' Opp'n 13.  This argument overlooks the *lack* of clarity in the instructions on that point.  Defendant argues that "'in reporting yield strength, as steel products are commonly (if not virtually exclusively) manufactured to various standards, {Prosperity} was required to code yield strength pursuant to the minimum yield strength required

of the standard to which the product was produced and not the actual yield strength of the product itself.'"  Def.'s Opp'n at 19 (quoting *Final Decision Mem.* at 13).  This argument misses the mark because Prosperity, rather than claiming to have reported yield strength based on actual yield strength, claimed that it reported yield strength according to its own manufacturing specifications.  *See* Prosperity's Reply Br. 10.

Defendant also argues that Prosperity erroneously "read each paragraph of the instructions in isolation" and failed to consider "whether subsequent paragraphs provided additional information that would clarify a term contained in a prior paragraph."  Def.'s Opp'n at 19-20.  The court's individual analysis of the four instructional paragraphs, presented above, demonstrates the flaw in this textual argument.

### 2.  Commerce Must Correct Its Error in the Redetermination upon Remand

Because Commerce invoked its authority to use facts otherwise available and an adverse inference according to an invalid finding that misreporting on the part of Prosperity occurred, Commerce must take appropriate corrective action and revise accordingly the affected weighted-average dumping margin (*i.e.*, either a margin for the combined Yieh Phui/Prosperity/Synn entity or, should it be necessary or appropriate for Commerce to reverse its collapsing decision, for Prosperity).[14]  In doing so, Commerce may not use facts otherwise available as a substitute for information that is now on the administrative record of the

---

[14] Commerce is not required to make any corrective action to the Department's use of facts otherwise available with an adverse inference for claimed errors by Synn in reporting yield strength.  Synn has not appeared in this action, and neither Prosperity nor Yieh Phui contest the application of facts available with an adverse inference to certain of Synn's home market sales.

investigation.  Subject to these requirements, the type of corrective action is a matter for Commerce to decide.[15]

## IV. CONCLUSION AND ORDER

For the reasons discussed in the foregoing, the court remands to Commerce the decision published as *Certain Corrosion-Resistant Steel Products From Taiwan: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 81 Fed. Reg. 35,313 (Int'l Trade Admin. June 2, 2016) ("*Final Determination*"), *as amended, Certain Corrosion-Resistant Steel Products From India, Italy, the People's Republic of China, the Republic of Korea and Taiwan: Amended Final Affirmative Antidumping Determination for India and Taiwan, and Antidumping Duty Orders*, 81 Fed. Reg. 48,390 (Int'l Trade Admin. July 25, 2016).  In its new determination, Commerce must: (1) correct its erroneous decision not to make adjustments in Yieh Phui's and Synn's home market sales prices to account for rebates granted to the companies' home market customers; (2) reconsider its decision to collapse Prosperity with the Yieh Phui/Synn entity and ensure that any new decision is based on findings supported by substantial record evidence; and (3) correct the errors resulting from the Department's unlawful decision to use the facts otherwise available and an adverse inference pertaining to the yield strength classification and coding of Prosperity's home market and U.S. market sales.

Therefore, upon consideration of all papers and proceedings had herein, and upon due deliberation, it is hereby

---

[15] The court leaves it to Commerce to determine whether it is essential to reopen the record to solicit additional cost information.

**ORDERED** that the Final Determination be, and hereby is, set aside as unlawful and remanded for reconsideration and redetermination in accordance with this Opinion and Order; it is further

**ORDERED** that Commerce shall file, within 90 days from the date of this Opinion and Order, a new determination upon remand ("Remand Redetermination") that conforms to this Opinion and Order and redetermines margins as necessary; it is further

**ORDERED** that plaintiffs and defendant-intervenors each may file comments on the Remand Redetermination within 30 days of the filing of the Remand Redetermination; and it is further

**ORDERED** that defendant may respond to the aforementioned comments within 15 days from the date on which the last comment is filed.

/s/  Timothy C. Stanceu
Timothy C. Stanceu, Chief Judge

Dated:  January 23, 2018
        New York, New York